736 P.2d 1186

**The VALLEY NATIONAL BANK, Conservator of the Estate of Martha Pray, an Adult Protected Person, and Jack Pray, Plaintiffs/Appellants,**

**v.**

**NATIONAL ASSOCIATION FOR STOCK CAR AUTO RACING, INC., aka Nascar, George Shotts and Oma Shotts, Jerry Hogan and Bette Hogan, Mel Bolas and Patricia Bolas, individually and as husbands and wives, and the Bop, Inc., Defendants/Appellees.**

No. 2 CA–CV 5918.

Court of Appeals of Arizona, Division 2, Department A.

March 12, 1987.

Review Denied May 5, 1987.

Law Offices of Richard D. Grand by Silas H. Shultz and Michael F. Rollins, Tucson, for plaintiffs/appellants.

Bury, Moeller, Humphrey & O'Meara by David C. Bury, Tucson, for defendants/appellees.

## OPINION

HOWARD, Presiding Judge.

This is an appeal from a general defense verdict in a personal injury case. We consider the facts in the light most favorable to the defendants. *McFarlin v. Hall*, 127 Ariz. 220, 619 P.2d 729 (1980).

The individual defendants are the incorporators of The BOP, Inc., a promoter of stock car races at Tucson International Raceway (T.I.R.). The Prays lived near Sierra Vista, Arizona, where Mr. Pray was employed at Fort Huachuca. He became acquainted with Brandon Rees, who also worked at Fort Huachuca and who raced at T.I.R. Mr. Rees suggested to Mr. Pray that the Prays should come to the Pima County Fairgrounds on September 15, 1984, to see the anniversary stock car races in which Rees was going to participate. Mr. Pray had extensive racing experience. He had been racing since 1946, he had been in hundreds of racetrack facilities including the pit areas, he was an experienced professional race car driver and had been a member of NASCAR. Martha Pray also had extensive experience at race tracks, although she was never a participant.

The Prays went to T.I.R. on September 15 to see the races. Although there was a grandstand for general spectators, Mr. Pray did not want to sit there. Instead, he wanted to be in the pit area in order to see his friend, Brandon Rees, and to be able to talk to him.

On this particular night, although several classes of cars were being raced, since one race was a NASCAR–sanctioned race, NASCAR rules governed the operation of the racetrack. One of these rules was that no spectators were to be allowed into the pit area.

The Prays went to the pit booth in order to buy a ticket to get into the pit area. The grandstand admission was $6, and the admission into the pit area was $10. The pit booth was a small room with three windows, one marked "free sheet," one "drivers," and one "pit crew." Prior to reaching the pit booth there was a table set up where every person who wanted to enter the pit booth area was required to sign a document entitled "Benefit Plan Registration—Release and Indemnity Agreement" (BP). Both Jack and Martha Pray signed one of these forms, which they then took with them while they waited in line at the pit booth window. The Prays went to the line for "drivers." There were about 30 or 40 people in line, and Mr. Pray had enough time to smoke a couple of cigarettes before he reached the booth.

Once the Prays reached the pit booth, the person at the window checked to see if the BP had been signed. They were not asked whether they were spectators, nor did they tell the lady at the booth that they were merely spectators. They were each given a

copy of the BP and they were each required to sign two additional documents. One was a "Release of Liability" and the other a pit pass. The Prays would not have been allowed to enter the pit area had they not signed all three of the documents. Although spectators were not allowed into the pit area, it was the practice at the racetrack not to ask the persons coming up to the pit booth whether or not they were there simply as spectators. However, if spectators went up to the pit booth and told the operator that they were just spectators and wanted to go into the pit area, they would be told that they would have to sit in the grandstands.

As for the three documents which the Prays signed, the BP contains a medical benefit plan and a release and indemnity agreement. The release and indemnity agreement in the BP releases NASCAR, the race track promoters and NASCAR employees from any liability due to their negligence in consideration, inter alia, of being allowed into the speedway or raceway premises of any NASCAR–sanctioned event. Immediately below the line where the Prays signed the document, the following appears in large bold type: "THIS IS A RELEASE, REGISTRATION AND INDEMNITY AGREEMENT." Ostensibly, this BP is for the benefit of persons who have been licensed by NASCAR or have applied for a NASCAR license.

The Release of Liability is a long document which recites at the top in large bold type: "THIS IS A RELEASE OF LIABILITY." It is a competitor's permit that contains, in bold type, the same type of release from liability as was contained in the BP. The terms of the release are followed by signature blocks. The page on which the Prays signed contains, in large type, "THIS IS A RELEASE OF LIABILITY." This phrase is repeated three times on the page.

The pit pass also contains a release of liability. The terms of the release are on the bottom of the pit pass, which is detachable and is kept at the pit booth. The top part was given to the Prays to be displayed by them at all times when they were in the pit area.

After paying the $10 and signing the documents, the Prays entered the pit area, which was protected by a fence, including "Jersey barriers" [1] where the area is adjacent to turn one. When the Prays entered the pit area, they set up two stools to watch the races near the hot dog stand. The area was elevated, and the Prays could easily watch the races and be protected by the barriers.

Because of the size of the race on that particular night, the designated pit area, the area which was behind the fence and barrier, was filled. For that reason, some of the drivers, including Brandon Rees, were pitted in an area about 200 feet from turn one of the half-mile race track. This area was not protected by the Jersey barriers. The Prays left the designated pit area to go over to where Mr. Rees was pitted. It was dangerous to be pitted in this area, and prior to the commencement of the race which eventually caused injuries to Mrs. Pray, racetrack officials had asked the drivers to remove their cars from that area. Mrs. Pray was sitting in a lawn chair next to Brandon Rees' trailer when, during a stock car race, two cars were involved in a collision. One of the cars scraped along the Jersey barrier, left the race track and ended up hitting the Rees trailer, causing severe head injuries to Mrs. Pray.

Because of his racing experience, Mr. Pray knew of the dangers at a race track and had himself flipped a vehicle into the grandstands in San Diego in 1947. Mrs. Pray was at the racetrack on that day, and if she did not see the accident she at least knew that the accident had occurred. Furthermore, Mr. Pray had, on more than one occasion, seen cars leave the racetrack and injure people.

Mrs. Pray, because of the brain damage, was unable to give any testimony in this case and did not attend the trial.

---

**1.** Jersey barriers are portable concrete forms which when placed together form a fence or barrier.

The plaintiffs contend (1) the releases were invalid as a matter of law; (2) the trial court erred in allowing deposition testimony to be read without requiring the deponent's corrections to be read as well; and (3) the trial court erred in instructing the jury on express and implied assumption of risk.

The verdict in this case eliminates the need to discuss the trial court's instructions on assumption of risk. Under the doctrine of comparative negligence, the jury is required to apportion the damages between the plaintiff and the defendant if it finds that the defendant was negligent and also finds that the plaintiff was guilty of contributory negligence or had assumed the risk. A.R.S. § 12–2505. Since there was only a general verdict here and no apportionment, the jury found either that the defendants were not negligent or that the releases signed by the Prays precluded them from recovering. We shall start our discussion with plaintiffs' contention that the releases were invalid as a matter of law.

Parties can expressly agree in advance that the defendant shall not be liable to the plaintiff for the defendant's negligence, absent public policy to the contrary. *Central Alarm of Tucson v. Ganem,* 116 Ariz. 74, 567 P.2d 1203 (App. 1977); W. Prosser and W. Keeton on Torts § 68 at 482 (5th Ed. 1984). See also 57 Am.Jur.2d Negligence §§ 20 et seq.; Annot. 68 A.L.R.3d 7 (1976); Annot. 49 A.L.R.3d 321 (1973); Annot. 8 A.L.R.3d 1393 (1966); Annot. 175 A.L.R. 8 (1948). Such an agreement is unenforceable on public policy grounds if:

" * * *

2. (a) [T]he term exempts an employer from liability to an employee for injury in the course of his employment; (b) the term exempts one charged with a duty of public service from liability to one to whom that duty is owed for compensation for breach of that duty, or (c) the other party is similarly a member of a class protected against the class to which the first party belongs. * * * "
Restatement (Second) of Contracts § 195.

The Restatement also notes in Comment *b* to § 195 that a party's attempt to exempt himself from liability for negligent conduct may fail as unenforceable under § 208 of the Restatement (Unconscionability).

Other jurisdictions have addressed the question in the context of racetrack release forms and have upheld the validity of the releases against challenges on public policy grounds. *Gore v. Tri-County Raceway, Inc.,* 407 F.Supp. 489 (M.D.Ala.1974); *Morrow v. Auto Championship Racing Ass'n Inc.,* 8 Ill.App.3d 682, 291 N.E.2d 30 (1972); *LaFrenz v. Lake County Fair Board,* 172 Ind.App. 389, 360 N.E.2d 605 (1977); *Winterstein v. Wilcom,* 16 Md.App. 130, 293 A.2d 821 (1972); *Lee v. Allied Sports Associates, Inc.,* 349 Mass. 544, 209 N.E.2d 329 (1965); *Theroux v. Kedenburg Racing Assoc.,* 50 Misc.2d 97, 269 N.Y.S.2d 789 (1965); *Seymour v. New Bremen Speedway, Inc.,* 31 Ohio App.2d 141, 287 N.E.2d 111 (1971); *French v. Special Services, Inc.,* 107 Ohio App. 435, 159 N.E.2d 785 (1958).

■ There is no public policy here which would render the releases invalid. There was no employment relationship between the defendants and the plaintiff, nor any unequal bargaining power which would make the release unconscionable. Mrs. Pray was under no compulsion, economic or otherwise, to be in the pit area. The activity, automobile racing, is not affected with a public interest and the defendants are not engaged in a private service. *LaFrenz v. Lake County Fair Board, supra.* Nor is Martha Pray a member of a class that is protected against the class to which the defendants belong.

■ This brings us to an examination of the release itself. In order to uphold the validity of an express agreement exempting the defendant from his negligence, it must appear that its terms were brought home to the plaintiff or if he did not know of the provision, that a reasonable person in his position would have known of it. Prosser & Keeton, supra, at 483–84.

At trial Mr. Pray testified that he and his wife did not have their reading glasses with them and did not know they were

signing releases.[2] He said that if he had known at that time what the documents contained, he would still have gone into the pit area, but he would not have allowed his wife to enter. He further testified that although they could not read the documents, they did not ask anyone to read them to them or explain what they were. Mr. Pray also stated that the Release of Liability form was folded in such a manner that one could not read the printed material which contained all the language concerning the release. In any event, he testified that he did not understand the language on the forms.

Mr. Pray's deposition testimony, however, was different. He testified that he understood the language on the forms and that he would have gone into the pit area even if he had read the documents. At his deposition, he did not except his wife as he did at trial. In addition, he testified as follows:

"Q. So no matter what was written on any form that you signed or the pit pass that you signed, no matter what was written there you could have decided to read it, couldn't you?

A. I could have read it.

Q. But you chose not to?

A. I had no reason to read it because it has been the same way for the last 40 years of the same old garbage to get in."

■ Plaintiffs contend that there was no valid release because the forms were never intended for spectators. Therefore, they argue, there was never a meeting of the minds. We do not agree. The Prays represented, by signing the documents, that they were not general spectators. They are now estopped from asserting otherwise in order to defeat the release. See *Lee v. Allied Sports Assoc., Inc.,* supra. The defendants clearly intended that anyone who obtained a pit pass must sign a release of liability.

■ The language of the Release of Liability clearly releases the defendants from all liability for negligence. In bold print it states that the Prays, in consideration of receiving permission to enter the premises:

\* \* \* \* \* \*

"... RELEASES, REMISES AND FOREVER DISCHARGES AND AGREES TO SAVE AND HOLD HARMLESS AND INDEMNIFY NASCAR AND SANCTIONING BODY AND THE PROMOTERS PRESENTING SAID EVENT, THE OWNERS, AND LESSEES OF THE PREMISES, THE PARTICIPANTS THEREIN, THE OWNERS, SPONSORS AND MANUFACTURERS OF ALL RACING EQUIPMENT USED IN SAID EVENT AND THE OFFICERS, OFFICIALS, DIRECTORS, AGENTS, EMPLOYEES AND SERVANTS OF ALL OF THEM, OF AND FROM ALL LIABILITY CLAIMS, DEMANDS, CAUSES OF ACTION AND POSSIBLE CAUSES OF ACTION WHATSOEVER, ARISING OUT OF OR RELATED TO ANY LOSS, DAMAGE OR INJURY (INCLUDING DEATH) THAT MAY BE SUSTAINED BY OUR RESPECTIVE PERSONS OR PROPERTY, THAT MAY OTHERWISE ACCRUE TO ANY OF US OR TO OUR RESPECTIVE HEIRS, NEXT OF KIN OR PERSONAL REPRESENTATIVES WHILE IN, ON, EN ROUTE TO, FROM, OR OUT OF SAID PREMISES FROM ANY CAUSE WHATSOEVER INCLUDING NEGLIGENCE OF ANY OF THE FOREGOING...."

In *LaFrenz v. Lake County Fair Board,* supra, involving a similar release, the court observed that the form and the language were so conspicuous that reasonable men could not reach different conclusions or question whether the deceased had knowingly and willingly signed the document. Here, too, the form of the release clearly brought home to the Prays its contents. Although they claim that they never knew

---

**2.** It has been held, in a case involving a release, that in the absence of fraud, overreaching, or excusable neglect, the one who signs an instrument may not avoid the impact of its terms on the ground that he failed to read the instrument before signing it. *Hulsey v. Elsinore Parachute Center,* 168 Cal.App.3d 333, 214 Cal.Rptr. 194 (1985). This is also the law in Arizona. See *Apolito v. Johnson,* 3 Ariz.App. 232, 413 P.2d 291, modified, 3 Ariz.App. 358, 414 P.2d 442 (1966); *Mutual Benefit Health & Accident Assoc. v. Ferrell,* 42 Ariz. 477, 27 P.2d 519 (1933).

it was a release because the above language was folded under the clip board so it could not be seen, there was evidence to the contrary, and this created a question of fact for the jury. The court did not err in refusing to hold the releases invalid as a matter of law.

After his deposition was taken in California, and after he had a chance to read it, Mr. Pray sent a handwritten, signed and notarized document to the court reporter in California who took his deposition. The document reads as follows:

"When I read my desposition [sic] there were certain sections that are not clear. I would like to simplify those sections by a statement which I hope corrects any misunderstanding that might appear in those sections. I am talking about pages 27 thru 29, 49 thru 53, 60 thru 62, 64 & 65.

As I stated in my deposition, I did not take time to read the papers which I signed. The reasons why I did not sit down and carefully read them are.

1. It was getting dark and I didn't have my reading glasses.

2. I assumed that these papers had to do with insurance.

3. No one told me that I might be giving up my right to sue for negligence.

During my deposition, I briefly looked over Exhibit C. I realy [sic] did not understand what I read. Since my deposition, I have gone through these documents a number of times. I still do not understand how they apply to me or my wife.

Exhibit C seems to be a form for drivers, car owners, officials, mechanics, promoters or sponsors. None of these applied to me. I was not a NASCAR member either.

I would like to add to my answer on Page 60, line 10, 16 & 20. First of all, this exhibit was never shown to me. I read it briefly during my deposition and said I understood it, I realy [sic] didn't. I don't understand it now, even though I have read it several more times. Frankly, it doesn't seem to apply to someone in me and my wife's situation.

Exhibit D seems to be a form which was intended to be used to register drivers and their crews, but was instead being used to sign up pit pass purchasers. I never saw exhibit D–A.

Exhibits A & B are stubs to the pit passes. I was never given an opportunity to read the writing on these stubs. What happened was, they shoved the pass over for signature and then tore off the stub. What I got was the part with no fine print. Just 'sign here and give us $10.00 a piece.'

If I had been told or even thought that I would be giving away my rights to sue for negligence, I would· not have signed the papers. In fact, I would have not gone into the pit area. I thought I was signing insurance forms.

Page 21 line 20 should be 'car' and not *care*

Page 93 line 23 should be 'talking' and not *taking*

Page 109 line 27 should be 'basis' and not *bases*

This is a correction and explanation of parts of my deposition reported by MARILYN E. FISHLER CSR NO. 5239 taken on Wednesday May 22, 1985 in Burbank Calif. by MR. DAVID BURY ESQ. and this is my signature to that deposition with corrections on 12 AUG 1985 in Camarello Caif [sic]. * * * "

The court reporter sent the document to Mr. Pray's attorney in Tucson, who had the original of the deposition.[3]

██ Just prior to commencing the trial the defendants moved the trial court to allow them to read Mr. Pray's deposition without reading the alleged "corrections," contending that Rule 30(e), Rules of Civil Procedure, 16 A.R.S., only allowed a deponent to correct clerical errors in his deposition, but did not allow him to substantively change his answers. The trial court agreed with the defendants that the "cor-

---

**3.** Although the record is not entirely clear, it appears that this deposition was never filed. Rule 3.7 of the Local Rules, Pima County, states that unless otherwise ordered by the court, depositions, interrogatories and answers thereto, shall not be filed with the court.

**380**

rections" were not part of Mr. Pray's deposition but ruled that Mr. Pray could make any explanation he wanted to on the stand as to why he didn't understand the question and what he meant to say, including the fact that he wrote a letter, after reading his deposition, containing these explanations. The plaintiffs contend that the trial court's refusal to consider the corrections as part of his deposition constituted reversible error. We agree that it was error, but not that it was reversible error.

Rule 30(c) states:

"When the testimony is fully transcribed the deposition shall be submitted to the witness for examination and shall be read to or by him, unless such examination and reading are waived by the witness and by the parties. *Any changes in form or substance which the witness desires to make shall be entered upon the deposition by the officer with a statement of the reasons given by the witness for making them....*" (Emphasis added.)

The rule, by its terms, allows changes in "substance." The federal courts under a similar rule hold that a witness may make a change so as to contradict directly on a material matter the testimony he had given during the examination, but this has the effect of making the examination incomplete and the parties may then examine the witness further in light of his new answers. *Erstad v. Curtis Bay Towing Co.*, 28 F.R.D. 583 (D.Md.1961); *Turchan v. Bailey Meter Co.*, 21 F.R.D. 232 (D.Del.1957); *Colin v. Thompson*, 16 F.R.D. 194 (W.D. Mo.1954). However, although the deponent has the right under the rule to substantively change his answers, the original answers still remain and he may be impeached by his former answers. *Lugtig v. Thomas*, 89 F.R.D. 639, 642 (N.D.Ill.1981); 8 C. Wright & A. Miller, Federal Practice and Procedure § 2118 at 436 (1970).

■ Since the trial judge here gave Mr. Pray the opportunity to explain the answers he gave at the deposition and to tell the jury he sent a letter noting these errors in his deposition after he had had a chance to read it, plaintiffs have not shown any prejudice.

Affirmed.

HATHAWAY, C.J., and
FERNANDEZ, J., concur.