965 P.2d 47

Ken BOTHELL and Bonita Bothell, individually and as parents and natural guardians of Akilah "Keely" Bothell, a minor, Plaintiffs/Appellants,

v.

TWO POINT.ACRES, INC.; Rio Rico Stables; Mary Barret and John Doe Barret, wife and husband, Defendants/Appellees.

No. 2 CA–CV 97–0089.

Court of Appeals of Arizona, Division 2, Department B.

Feb. 26, 1998.

Review Denied Oct. 20, 1998.

The Kimble Firm by Stephen Kimble and David F. Toone, Tucson, for Plaintiffs/Appellants.

Goering, Roberts, Berkman, Rubin & Brogna, P.C. by Chris L. Enos and David L. Berkman, Tucson, for Defendants/Appellees.

PELANDER, Presiding Judge.

¶ 1   In this personal injury action, plaintiffs/appellants appeal from the trial court's entry of summary judgment for defendants/appellees and from its order denying plaintiffs' cross-motion for partial summary judgment. We vacate the summary judgment for defendants and direct the trial court to enter partial summary judgment for plaintiffs on defendants' statutory immunity claim.

## FACTS AND PROCEDURAL BACKGROUND

¶ 2   On appeal from a grant of summary judgment, we view all facts and reasonable inferences therefrom in the light most favorable to the party against whom judgment was entered. *Prince v. City of Apache Junction*, 185 Ariz. 43, 912 P.2d 47 (App. 1996). Plaintiff Akilah "Keely" Bothell, who was ten years-old at the time in question, was enrolled in an after-school horse riding/care program with defendant Rio Rico Stables one afternoon per week with several other children. The program, supervised by defendant Mary Barratt,[1] began for that group in the fall of 1994. On October 22, 1994, Keely and her father, plaintiff Ken Bothell, signed a preprinted release that defendants required program enrollees to execute. The release, a copy of which we append to this opinion, provided in part:

> I (Rider) understand that horses are unpredictable and that participation in activities in the presence of horses always involves an element of risk. I clearly understand the following:

* * *

- This horse riding or horse-drawn activity involves specific risks of property damage or personal injury to me or my minor children arising from approaching, handling, mounting, riding and dismounting the horse or horse-drawn vehicle, and from observing or participating in this activity, but that I nevertheless intentionally agree to assume these risks;
- Upon mounting, and taking up the reins, I, the Rider, am in primary control of the horse I am riding, and Rio Rico Stables is not responsible for the results of my action or inaction;

* * *

> I therefore specifically release Rio Rico Stables and its employees from all responsibility for injuries I may receive from the horse riding or horse-drawn vehicle activity, and agree to hold Rio Rico Stables and its employees blameless from any present and future claims that may be made on my behalf for any injuries received, including damage arising out of negligence by Rio Rico Stables or its employees. . . .

¶ 3   Keely was injured on March 15, 1995, after the children had finished their ride and were grooming and feeding their horses. Because her regular horse (Satin) was lame, Keely had ridden another horse that day. After the ride, Keely asked Mary Barratt if she (Keely) could take Satin from a nearby corral to a grassy area to eat. According to Keely, Mary Barratt allowed her to do so. Mary Barratt directed Keely to get a halter and lead rope for Satin, which Keely then did.

¶ 4   In the corral with Satin was a young horse which had not been fully trained. Keely went by herself into the corral and placed the halter and lead rope on Satin. She then walked Satin to the corral gate and climbed through the fence to open the gate from the outside. When Satin started to walk away, Keely wrapped the lead rope around her left hand. The other horse in the corral then

---

1.   Although all of the pleadings, motions, and the trial court's judgment identify the individual defendants as "Mary Barret and John Doe Barret," the record contains a recorded statement by her indicating their last name actually is spelled "Barratt," and his name is James G. Barratt. Therefore, we use that spelling in this opinion.

approached Satin, hit the rope, apparently became scared and ran through it. That caused the rope to tighten around Keely's hand, seriously injuring it.

¶ 5   In their complaint, plaintiffs alleged, *inter alia*, negligent supervision, training and instruction of business invitees like Keely. Defendants moved for summary judgment based on the release and A.R.S. § 12–553, which immunizes equine owners from liability under certain prescribed circumstances. Plaintiffs opposed the motion and moved for partial summary judgment, contending that both § 12–553 and the release are inapplicable to the facts at issue, and that the release "is vague and therefore void." The trial court granted defendants' motion and denied plaintiffs' cross-motion. This appeal followed the trial court's entry of judgment for defendants.

## DISCUSSION

### I.   Jurisdiction

¶ 6   We first address two preliminary questions, not discussed by the parties, relating to this court's jurisdiction.[2] First, in a counterclaim, defendants (based on the release) sought indemnification from plaintiffs for any judgment they might obtain against defendants, as well as attorney's fees and costs incurred in defending this action. The trial court did not expressly rule on the counterclaim or include language in its judgment under Rule 54(b), Ariz.R.Civ.P., 16 A.R.S. Those omissions, however, do not divest this court of jurisdiction in view of the following circumstances: the trial court's entry of summary judgment for defendants rendered their indemnification claim moot; the judgment awarded taxable costs to defendants; and defendants ultimately waived their claim for attorney's fees.[3] Those developments, in essence, disposed of defendants' counterclaim, rendered the trial court's judg-

ment "final," and terminated the action *in toto* for purposes of Rule 54(b).

¶ 7   Second, plaintiffs' appeal challenges not only the trial court's entry of summary judgment for defendants, but also its order denying plaintiffs' cross-motion for partial summary judgment. Such an order is neither appealable nor generally subject to review on appeal from a final judgment. *Grain Dealers Mut. Ins. Co. v. James*, 118 Ariz. 116, 575 P.2d 315 (1978) (refusing to address merits of appellant's cross-motion for summary judgment, which trial court had denied, despite reversing summary judgment for appellee); *Sorensen v. Farmers Ins. Co.*, 191 Ariz. 464, 957 P.2d 1007 (Ct.App.1997); *McCallister Co. v. Kastella*, 170 Ariz. 455, 825 P.2d 980 (App.1992). In order to avoid piecemeal litigation, however, we may consider the merits of plaintiffs' cross-motion and direct entry of summary judgment in their favor if they are entitled to that as a matter of law and there are no genuine issues of material fact precluding it. *See Mealey v. Orlich*, 120 Ariz. 321, 585 P.2d 1233 (1978); *State Farm Mut. Auto. Ins. Co. v. Peaton*, 168 Ariz. 184, 812 P.2d 1002 (App.1990).

### II.   Standard of Review

¶ 8   On appeal from a summary judgment, we must determine *de novo* whether there are any genuine issues of material fact and whether the trial court erred in applying the law. *Prince*. In addition, issues involving statutory interpretation and whether a release form automatically exempts a defendant from liability are questions of law subject to this court's *de novo* review. *Id.; Sirek v. Fairfield Snowbowl, Inc.*, 166 Ariz. 183, 800 P.2d 1291 (App.1990).

### III.   Summary Judgment

¶ 9   Plaintiffs contend that neither the release that Keely and her father signed nor § 12–553 applies under the facts of this

---

**2.**   The parties state, without elaboration, that this court has jurisdiction of the appeal under A.R.S. § 12–2101(B). We are not bound by that concession, however, because of this court's independent duty to determine whether we have jurisdiction. *Sorensen v. Farmers Ins. Co.*, 191 Ariz. 464, 957 P.2d 1007 (Ct.App.1997).

**3.**   Before defendants waived their claim for fees, the trial court had awarded them reasonable fees and costs when it granted their motion for summary judgment.

case to bar defendants' liability as a matter of law. Plaintiffs further assert that basing summary judgment for defendants on the release violates article XVIII, § 5, of the Arizona Constitution, because it conclusively "attempt[s] to advance the defense of assumption of the risk." We agree with the first contention and therefore do not address the second.[4]

### A. The Release

¶ 10 A prospective exculpatory covenant like defendants' release must be strictly construed against the party seeking to enforce it. *Morganteen v. Cowboy Adventures, Inc.*, 190 Ariz. 463, 949 P.2d 552 (App. 1997); *Sirek*. Indeed, Arizona courts view such provisions with disfavor:

> The law disfavors contractual provisions by which one party seeks to immunize himself against the consequences of his own torts. Although there are exceptions to the principle disfavoring attempts to gain immunity, they are narrowly drawn and posit that certain conditions are met—that there is no public policy impediment to the limitation, and that the parties did, *in fact*, bargain for the limitation. Finally, a rule of construction governing the interpretation of such limitations requires that the limiting language be construed most strictly against the party relying on it.

*Salt River Project Agric. Improv. & Power Dist. v. Westinghouse Electric Corp.*, 143 Ariz. 368, 383, 694 P.2d 198, 213 (1984) (citations omitted). *See also Maurer v. Cerkvenik–Anderson Travel, Inc.*, 181 Ariz. 294, 298, 890 P.2d 69, 73 (App.1994), *quoting Salt River Project*, 143 Ariz. at 382, 694 P.2d at 212 ("Attempts to release oneself from liability by contract for harm caused by one's own negligence are not looked upon with favor. 'This would tend to encourage carelessness.'").

¶ 11 At the time of her accident, Keely was not riding a horse, or preparing or attempting to ride a horse. Nor was she engaged in conduct directly relating to horse-riding activities, such as mounting or dismounting a horse or taking its reins. Rather, Keely was injured after finishing her ride and while engaged sometime later, allegedly with Mary Barratt's knowledge and permission, with a totally different horse (Satin) in a separate activity unrelated to riding. The gist of plaintiffs' claim is negligent supervision of that distinct activity.

¶ 12 By signing the release, Keely and her father acknowledged various risks associated with "horse riding or horse-drawn activity," including risk of injury "from approaching, handling, mounting, riding and dismounting the horse or horse-drawn vehicle." They further acknowledged that "participation in activities in the presence of horses always involves an element of risk;" "[u]pon mounting, and taking up the reins," the rider is "in primary control of the horse;" "horse riding or horse-drawn vehicle activity will be across open range and through brush-covered wilderness;" and "horses are *not completely predictable*, and any horse can on occasion become frightened or upset, so as to rear up and run away." Plaintiffs contend that despite those acknowledgements in the release, its own terms specifically released defendants only from all responsibility for injuries a rider may receive "from the horse riding or horse-drawn vehicle activity," and that Keely was not involved in any such activity at the time of her injury. Because the release also describes "horse riding or horse-drawn activity" as including risks of injury "arising from approaching [and] handling" a horse, however, reasonable minds may differ on whether the release covers the specific activity in which Keely was engaged at the time of the accident.

4. Plaintiffs did not raise any constitutional issues in the trial court, and on appeal they only challenge the constitutionality of summary judgment for defendants based on the release. *See Morganteen v. Cowboy Adventures, Inc.*, 190 Ariz. 463, 949 P.2d 552, 555 n. 5 (App.1997) (recognizing but not addressing the possible applicability of article XVIII, § 5, to prospective exculpatory covenants). We generally do not address issues raised for the first time on appeal, *Cohn v. Industrial Comm'n*, 178 Ariz. 395, 874 P.2d 315 (1994), and decide cases on nonconstitutional grounds if possible. *Little v. All Phoenix South Community Mental Health Center, Inc.*, 186 Ariz. 97, 919 P.2d 1368 (App.1995).

¶ 13 The parties' testimony in this case illustrates that dichotomy. Consistent with plaintiffs' limited interpretation of the release language, Mr. Bothell testified in his deposition that he signed the release "basically thinking that if something happened to my daughter while she was on a horse or riding that I would not or could not hold Mary Barret [sic] responsible for it." In contrast, Mrs. Barratt understood the release to cover risks of injury from "[h]orse activities of any kind that involves a horse."

¶ 14 Although we disagree with plaintiffs' contention that "[i]t is merely a fortuity that the accident involved a horse," a trier of fact reasonably may find that the activity in which Keely was engaged and which caused her accident is outside the scope of defendants' release. Conversely, a trier of fact may find that the release does cover the factual scenario in this case. In our view, the release here does not necessarily cover the non-horse-riding activity in which Keely was engaged, and which Mary Barratt allegedly permitted and failed to properly supervise, at the time of the accident.[5] Construing the release strictly, as we must, we hold it does not automatically apply to the facts of this case so as to bar liability as a matter of law. *See Morganteen.* If defendants wanted to insulate themselves from every claim relating to any aspect of their stable and horse operations, they "should have clearly and explicitly stated so in the ... agreement." *Sirek,* 166 Ariz. at 187, 800 P.2d at 1295.[6]

¶ 15 *Valley National Bank v. National Ass'n for Stock Car Auto Racing, Inc. (NASCAR),* 153 Ariz. 374, 736 P.2d 1186 (App.1987), relied on by defendants, is distinguishable and does not support summary judgment for them here. Unlike this case, *NASCAR* involved an appeal from a general defense verdict after a jury trial. The plaintiffs in that case, a former professional race car driver and his wife, signed several releases in order to gain access to the pit area at a racetrack. Although this court affirmed the judgment entered on the jury verdict and upheld the trial court's refusal "to hold the releases invalid as a matter of law" in *NASCAR, id.* at 379, 736 P.2d at 1191, we did not hold that the releases immunized the defendants from suit or automatically absolved them of liability as a matter of law. Rather, we concluded that conflicting evidence concerning the plaintiffs' execution and alleged lack of knowledge of the releases "created a question of fact for the jury." *Id. See Morganteen* (distinguishing *NASCAR* and holding that enforceability of riding stable's release, in case involving plaintiff who had been bucked off horse, involved factual questions precluding summary judgment). We reach a similar conclusion here.

### B. Statutory Immunity

¶ 16 As they did in the trial court, defendants also rely on § 12–553 to support their position. That statute, enacted in 1994, provides:

A. An equine owner or an agent of an equine owner who regardless of consideration allows another person to take control of an equine is not liable for an injury to or the death of the person if:

1. The person has taken control of the equine from the owner or agent when the injury or death occurs.

2. The person or the parent or legal guardian of the person if the person is under eighteen years of age has signed a release before taking control of the equine.

3. The owner or agent has properly installed suitable tack or equipment or the person has personally tacked the equine with tack the person owned, leased or borrowed. If the person has personally tacked the equine, the person assumes full responsibility for the suitability, installation and condition of the tack.

4. The owner or agent assigns the person to a suitable equine based on a reasonable interpretation of the person's

---

5. In her deposition, Mary Barratt acknowledged that it would have been inappropriate if she had allowed, or directed, Keely to go into a corral containing loose horses to halter Satin.

6. Although the release does not support summary judgment for defendants, it may be relevant, admissible, and appropriate for the trier's consideration in conjunction with defendants' affirmative defenses.

representation of his skills, health and experience with and knowledge of equines.

**B.** Subsection A does not apply to an equine owner or agent of the equine owner who is grossly negligent or commits wilful, wanton or intentional acts or omissions.

**C.** As used in this section:

1. "Equine" means a horse, pony, mule, donkey or ass.

2. "Release" means a document that a person signs before taking control of an equine from the owner or owner's agent. A signed release acknowledges that the person is aware of the inherent risks associated with equine activities, is willing and able to accept full responsibility for his own safety and welfare and releases the equine owner or agent from liability unless the equine owner or agent is grossly negligent or commits wilful, wanton or intentional acts or omissions.

¶ 17  "The primary rule of statutory construction is to find and give effect to legislative intent." *Mail Boxes, etc. v. Industrial Comm'n*, 181 Ariz. 119, 121, 888 P.2d 777, 779 (1995). We focus first on the statutory wording and, if it is ambiguous or inconclusive, we consider the statute's "context, subject matter, historical background, effects, consequences, spirit, and purpose." *Id.* at 122, 888 P.2d at 780. In addition, because § 12–553 "limits common law liability to invitees, it must be strictly construed." *Stramka v. Salt River Recreation*, 179 Ariz. 283, 285, 877 P.2d 1339, 1341 (App.1994). *See also Hayes v. Continental Ins. Co.*, 178 Ariz. 264, 872 P.2d 668 (1994); *Walker v. City of Scottsdale*, 163 Ariz. 206, 786 P.2d 1057 (App.1989).

¶ 18  The language of § 12–553 is not totally "clear and unambiguous." *Hayes*, 178 Ariz. at 268, 872 P.2d at 672. For example, the statute does not define or explain when a person is deemed to have "taken control" of an equine,[7] § 12–553(A)(1), nor

does it indicate whether immunity is conditioned on a signed release that specifically and explicitly recites, verbatim, each of the acknowledgements referred to in § 12–553(C)(2). In view of those ambiguities, we consider other relevant factors in attempting to determine the statute's meaning and effect. *Hayes*.

¶ 19  Section 12–553 emanated from House Bill (H.B.) 2425 in the 1994 second regular legislative session. According to minutes of the House Judiciary Committee, the bill's sponsor stated "the equine industry feels threatened by lawsuits" and further remarked, "[w]ith this bill, if a release is signed, individuals are responsible for their own actions once they have taken control of the equine animal."[8] The legislative committee minutes do not elaborate further on the bill's intended scope.

¶ 20  A Senate "Fact Sheet" relating to H.B. 2425, prepared by Senate staff almost two weeks after the legislature had passed the bill and three days after the governor had signed it, defined the bill's purpose as follows: "Provides limited liability for owners or agents of equines who allow another person to take control of the equine and it results in injury or death to the person." The Fact Sheet also furnished the following limited background on the bill: "An increase in liability lawsuits and the current cost of liability insurance has created a deterrence for some owners and agents of equine activities to continue with those activities. H.B. 2425 limits the liability of a [sic] equine owner or agent for injuries and deaths that occur when the equine is under the control of another person." Assuming the Fact Sheet is relevant to our search for legislative intent, it sheds some light on the statute's purpose, context, historical background and subject matter. Viewed in their entirety, however, the available legislative materials relating to

---

7. As noted above, however, defendants' release states that a rider is "in primary control of the horse" "[u]pon mounting, and taking up the reins," activities in which Keely was not engaged at the time of her accident.

8. We may take judicial notice of minutes of legislative committee hearings. *Hayes*. Interestingly, the committee chairman reportedly said the bill "attempts to raise the standard of liability," but further stated, inaccurately, that "[i]f it can be proven that an owner or agent was negligent, that person can still be held liable."

§ 12–553 are of limited help in determining the intended scope or effect of the statute.[9]

¶ 21  We also have examined the scant legislative records of the first regular session of 1993, in which a similar bill (H.B. 2297) was first introduced but not passed.  Unlike § 12–553, H.B. 2297 provided, with specified exceptions, that any "equine activity sponsor, equine professional or other person is not liable for an injury to or the death of a participant that results from the inherent risks of equine activities," and specifically defined "equine activity" and "inherent risks of equine activities."[10]  In any event, the bill was defeated in a Senate committee.

¶ 22  In sum, the parties have not furnished us with, nor have we found, any relevant legislative records indicating an intent to immunize stable owners from claims for negligent supervision, like plaintiffs', which do not involve horseback riding or activities directly relating thereto.  In our view, § 12–553 does not shield the defendants in this case from liability.  Keely clearly had not taken control of the horse which apparently caused her injury.  Assuming *arguendo* Keely had "taken control" of the other horse (Satin) when her injury occurred, § 12–553(A)(1), and further assuming defendants' release complies with the statutory definition in § 12–553(C)(2), we find the statute inapplicable to the non-riding activities in which she was engaged at the time of this particular accident.

¶ 23  As plaintiffs point out, "it would not make sense to require proper installation of suitable tack, or assignment of an equine suitable to the rider's·skill and experience, if the statute applied to non-riding situations." § 12–553(A)(3), (4).  We do not read § 12–553 as providing blanket immunity for a stable operator, regardless of how, when, and where one of its customers is injured by a horse.  Accordingly, the statute does not bar liability against defendants or support summary judgment for them in this particular case.

## DISPOSITION

¶ 24  We vacate the summary judgment for defendants, direct the trial court to enter partial summary judgment in favor of plaintiffs as to defendants' immunity claim under § 12–553, and remand for further proceedings consistent with this opinion.  Finally, assuming A.R.S. § 12–341.01 applies to this case, *see Sirek*, in our discretion we deny plaintiffs' request for attorney's fees on appeal.

ESPINOSA and HOWARD, JJ., concur.

9.  A Senate floor amendment to the bill, initially adopted but later removed, conditioned enactment of the statute on Arizona's electorate voting to amend article II, § 31 and article XVIII, §§ 5 and 6 of Arizona's Constitution (tort reform referendum) at the next general election.

10.  Legislative committee minutes relating to H.B. 2297 indicate the bill was based on a Colorado statute.  *See* Colo.Rev.Stat. Ann. § 13–21–

119.  Other states have enacted similar statutes limiting liability of equine activity sponsors.  *See, e.g.,* N.M.Stat. Ann. §§ 42–13–1 through 42–13–5; N.D.Cent.Code §§ 53–10–01, 53–10–02; Or. Rev.Stat. §§ 30.691, 30.693; Wash.Rev.Code Ann. §§ 4.24.530, 4.24.540; Wis.Stat.Ann. § 895.481.  We have found no reported decisions, however, interpreting such statutes in cases similar to this.

# APPENDIX

## ΔΔ.
# Two Point Acres, Inc.

Rio Rico Stables, Rio Rico, Arizona 85648

## · RELEASE

Release executed on __10-22__, 1994, by __KENNETH W. Bothell__

of __RIO RICO    AZ    85048__

City, State, Zip

herein referred to as Rider.

I (Rider) understand that horses are unpredictable and that participation in activities in the presence of horses always involves an element of risk. I clearly understand the following:

- The fairness and meaning of this Agreement, and I acknowledge that I have been given the opportunity to ask any questions concerning this matter;

- This horse riding or horse-drawn activity involves specific risks of property damage or personal injury to me or my minor children arising from approaching, handling, mounting, riding and dismounting the horse or horse-drawn vehicle, and from observing or participating in this activity, but that I nevertheless intentionally agree to assume these risks;

- Upon mounting, and taking up the reins, I, the Rider, am in primary control of the horse I am riding, and Rio Rico Stables is not responsible for the results of my action or inaction;

  I am aware that the horse riding or horse-drawn vehicle activity will be across open range and through brush-covered wilderness, and "wild animals" including snakes, cats and coyotes live in the area, and loose cattle are roaming on this land. I further know that horses are <u>not completely predictable</u>, and any horse can on occasion become frightened or upset, so as to rear up and run away;

  I will follow the guide's instructions at all times;

  I know I can be given horseback riding instruction by Rio Rico Stables at their arena;

  I further understand that I can be held responsible for injuries to Rio Rico Stables' rental horses, damages to this stable's premises and/or trails, equipment, property owned by others and injuries to other riders or pedestrians, which I may cause if I do not act in a sensible and responsible manner.

I therefore specifically release Rio Rico Stables and its employees from all responsibility for injuries I may receive from the horse riding or horse-drawn vehicle activity, and agree to hold Rio Rico Stables and its employees blameless from any present and future claims that may be made on my behalf for any injuries received, including damage arising out of negligence by Rio Rico Stables or its employees. I shall pay all costs and attorneys' fees from any legal proceedings which I may bring contrary to this agreement and which is resolved in favor of Rio Rico Stables or its employees.

A protective helmet has been offered to wear while mounting, riding and dismounting my horse. I have accepted _X_ / declined _____ the use of this helmet (initial appropriate response).

I understand that this Agreement is entered into in the State of Arizona, and will be interpreted and enforced under the laws of that state

I, the undersigned, being of sound mind and not under the influence of alcohol, drugs or other intoxicants, have read and understand the foregoing release.

Signature of Rider: _____ Age (if minor): _10_

Signature of parent or guardian: _____