IN THE COURT OF APPEALS
STATE OF ARIZONA
DIVISION TWO

FILED BY CLERK

MAY 30 2007

COURT OF APPEALS
DIVISION TWO

| | | |
|---|---|---|
| In re the Estate of | ) | 2 CA-CV 2006-0138 |
| | ) | DEPARTMENT A |
| ELLIOT GOLDMAN, | ) | |
| | ) | O P I N I O N |
| Deceased. | ) | |
| | ) | |
| | ) | |
| | ) | |

APPEAL FROM THE SUPERIOR COURT OF PIMA COUNTY

Cause No. P26182

Honorable Clark Munger, Judge

AFFIRMED

Duffield Young Adamson, P.C.
  By K. Alexander Hobson

Tucson
Attorneys for Petitioner/Appellee
Jewish Community Foundation of
Southern Arizona

Robert Barlow

Phoenix
Attorney for Respondent/Appellant
Jay Goldman

P E L A N D E R, Chief Judge.

¶1 In this probate action, appellant Jay Goldman, personal representative (PR) of the Estate of Elliot Goldman, appeals from a summary judgment entered in favor of appellee, the Jewish Community Foundation of Southern Arizona. Jay argues that, because the estate asset value at Elliot's death was insufficient to pay a devise to the Foundation and "date of death values are considered in determining whether abatement occurs," the devise to the Foundation abated, and the trial court erred in concluding otherwise. We disagree and, therefore, affirm the judgment.

## BACKGROUND

¶2 Although the pertinent facts apparently are undisputed, on appeal from a summary judgment, "we view all facts and reasonable inferences therefrom in the light most favorable to the party against whom judgment was entered." *Bothell v. Two Point Acres, Inc.*, 192 Ariz. 313, ¶ 2, 965 P.2d 47, 49 (App. 1998). Elliot Goldman died in December 1995, and his brother, Jay Goldman, was appointed PR of the estate. In its first article, Elliot's will provided that "all expenses of [his] last illness and funeral, costs of administration . . . and estate and inheritance taxes" were to be paid "from the residue of [his] estate." Article four of the will created trusts for each of Elliot's two children with the value of each trust "not [to] exceed $900,000," including any life insurance proceeds. In that same article, as amended by a subsequent codicil, Elliot also made several "specific bequests," including $250,000 and the marital residence to his wife; $25,000 to his cousin; $20,000 to his business manager; and $300,000 to Jay.

¶3 In the will's fifth article, Elliot made devises to several charitable organizations, to be made "[a]fter payment of expenses, costs and other items under [the first article] and the distribution provided in [the fourth] Article." Those devises provided $10,000 to the Community Food Bank of Tucson; $25,000 to Jewish Family Service of Tucson; $15,000 to the Congregation Chofetz Chayim; and $50,000 to the Foundation. That article further provided: "[I]n the event there are insufficient assets to pay the [fifth article] specific bequests, then the assets on hand shall be first used to pay [Elliot's wife] . . . to the extent possible, and any remaining assets shall be used to pay the [remaining] specific bequests . . . on a pro rata basis." Any residue of the estate was to go to the children's trusts.

¶4 Jay valued the estate's assets as of the date of Elliot's death at $2,732,733, consisting of $2,676,690 originally reported in the estate's "Beginning Inventory" plus another $56,043 Jay subsequently discovered. Jay averred that the children's trusts received $521,147 in insurance proceeds and that the fourth article bequests ultimately totaled $2,023,853. Jay also averred that the first article payments—including estate debt, funeral and administration expenses, and estate taxes—totaled $1,535,642. Thus, the first and fourth article payments, which the will directed to be made before the fifth article devises, exhausted the estate's assets as originally valued.

¶5 In 2003, the estate's real property was appraised again, and an increase in its value resulted in an estate balance of $1,844,650.64 in November 2004. From Elliot's death

3

to November 2004, Jay made payments to all of the fifth article devisees other than the Foundation, presumably at least in part from this increase. Jewish Family Service received $25,000; the Congregation Chofetz Chayim received $16,000 ($1,000 more than Elliot devised to it); and the Community Food Bank received $10,000. Jay also made payments to himself and to Elliot's wife that exceeded the amounts left to them in the will's fourth article. But he did not pay the Foundation's devise.

¶6　　　　Jay averred he initially did not pay that devise "due to [his] concerns about the ability of the Foundation to accomplish the goals [Elliot had] intended." The $50,000 Elliot had left to the Foundation was, in Jay's opinion, "not sufficient to permanently endow an annual trip to Israel" as Elliot had intended. Therefore, after offering to combine the devise with a gift from his parents to establish a fund that would be shared with another office of the Foundation, Jay finally offered to pay the Foundation $25,000. The Foundation rejected those offers and asked for an accounting of the estate. Shortly thereafter, in August 2004, the Foundation petitioned the probate court for an order to show cause seeking payment of the $50,000 devise to it.

¶7　　　　The court ordered Jay "to show cause . . . why the devise of $50,000 due to [the Foundation], together with interest," should not be paid and to produce an accounting, which Jay provided in January 2005. After hearing oral argument on the parties' cross-motions for summary judgment, the probate court concluded the devise to the Foundation had not abated and granted summary judgment in favor of the Foundation. In so ruling, the

4

court stated "Arizona law governing abatement of devises under a will is applied to the value of the estate at the time of distributions, not to the value of the estate as determined at date of death or as reported on a Federal estate tax return." Accordingly, the court ordered Jay to pay the Foundation $50,000 "with interest at the legal rate of 10% from January 22, 1997 until paid in full." This appeal followed.

## DISCUSSION

¶8 Jay contends "[d]ate of death values are considered in determining whether abatement occurs." Because the first and fourth article bequests exhausted the estate asset value at the time of Elliot's death, Jay argues, the fifth article devises abated. According to Jay, "[a]ny post death appreciation would benefit the creditors and the unabated beneficiaries," and "[t]here is no legal basis for claiming an abated beneficiary interest is somehow resurrected because probate assets later appreciate in value." Thus, he maintains, "the trial court erred in concluding as a matter of law that date of distribution and not date of death values are considered in determining whether abatement applies."

¶9 "On appeal from a summary judgment, we must determine *de novo* whether there are any genuine issues of material fact and whether the trial court erred in applying the law." *Bothell*, 192 Ariz. 313, ¶ 8, 965 P.2d at 50. We also review de novo "issues involving statutory interpretation." *Id*.

¶10 "'Abatement' is the reduction of testamentary legacies because estate assets are insufficient to pay debts and other legacies." *In re Estate of Mason*, 190 Ariz. 312, 314

5

n.3, 947 P.2d 886, 888 n.3 (App. 1997), *citing* Thomas E. Atkinson, *Law of Wills* § 136 (2d ed. 1953). Under A.R.S. § 14-3902(A), "shares of distributees abate . . . in the following order:" (1) "Property not disposed of by the will," (2) "Residuary devises," (3) "General devises," (4) "Specific devises." With the exception of the residence willed to Elliot's wife, the devises at issue here are all general devises. *See* Atkinson, *supra*, § 132 ("A 'general legacy' is one which is payable out of general assets of the estate and which does not require the delivery of any specific thing."). The statute further provides that "[a]batement within each classification is in proportion to the amounts of property each of the beneficiaries would have received if full distribution of the property had been made in accordance with the terms of the will." § 14-3902(A).

¶11     Elliot's will, however, provided that the first article expenses and fourth article devises should be paid before the fifth article devises. And § 14-3902(B) provides that, "if the testamentary plan . . . would be defeated by the order of abatement stated in subsection A, the shares of the distributees abate as may be found necessary to give effect to the intention of the testator." Thus, under Elliot's will, the fifth article devises would abate before those in the fourth article. But, contrary to the method Jay followed by ultimately withholding payment from only one devisee, each fifth article devise would abate in proportion to the amount allocated to it in the will. *See* § 14-3902(A). Likewise, the residuary devises to the children's trusts would also abate, even before the general devises set forth in the fifth article. *See id.*

¶12      As noted above, although payment of the first and fourth article devises exhausted the value of the estate's assets at Elliot's death, that value subsequently increased before the estate was closed. As a result, the estate ultimately was sufficient to cover all of the other fifth article devises and to maintain a remaining balance, apparently totaling more than $1,800,000 as of November 2004. Therefore, we must determine whether an estate should be valued for abatement purposes at a fixed amount at the time of the testator's death, or rather, as the Foundation argues, "abatement occurs or does not occur based on the value of the assets as finally distributed from the estate."[1]

¶13      As Jay points out, this appears to be an issue of first impression in Arizona and possibly the nation as a whole. The parties have not cited, nor have we found, any Arizona case law or statutes directly on point. Nor does the Uniform Probate Code, on which Arizona's probate statutes are based, *see* 6 A.R.S. p. 13, address the issue raised here. Several Arizona statutes, however, are instructive.

---

[1]If an estate should be valued for abatement purposes at the time of the testator's death, as Jay urges, we agree with him that his payments to the other fifth article devisees, and even the overpayment to himself, would not necessarily affect the abatement of the Foundation's devise. Indeed, Jay acknowledges that if his argument is correct, "Article Fifth bequests abate in their entirety," abatement "applies to all Article Fifth beneficiaries," and Arizona law "permits the Personal Representative to recover those previous improper distributions to abated [Article Fifth] beneficiaries." *See* A.R.S. § 14-3909 ("Unless the distribution or payment no longer can be questioned because of adjudication, estoppel or limitation, a distributee of property or money improperly distributed or paid, or a claimant who was improperly paid, is liable to return the property improperly received and its income since distribution if he has the property . . . [and otherwise] is liable to return the value as of the date of disposition of the property improperly received and its income and gain received by him.").

7

¶14 First, A.R.S. § 14-1201(16) defines the term "estate" to "include[] the property of the decedent, trust or other person whose affairs are subject to this title as originally constituted and *as it exists from time to time during administration*." (Emphasis added.) Thus, a decedent's estate is not fixed at the time of his or her death, but rather, includes property existing at that time and throughout the administration of the estate. The legislature's use of the term "property" in statutorily defining an "estate" does not exclude income or property appreciation and, in fact, implies that such increases should be included in the estate "as it exists from time to time during administration." *Id*.

¶15 Additionally, A.R.S. § 14-3708 requires a PR, under some circumstances, to supplement the initial inventory filed pursuant to A.R.S. § 14-3706:

> If any property not included in the original inventory comes to the knowledge of a personal representative or *if the personal representative learns that the value or description indicated in the original inventory for any item is erroneous or misleading*, he shall make a supplementary inventory or appraisement showing the market value as of the date of the decedent's death of the new item *or the revised market value or descriptions*, and the appraisers or other data relied upon, if any, and file it with the court if the original inventory was filed, or furnish copies thereof or information thereof to persons interested in the new information.

§ 14-3708 (emphasis added). In closing an estate after unsupervised probate proceedings, a PR also must verify that "the assets of the estate have been distributed to the persons entitled" and must "furnish[] a full account in writing of the [PR]'s administration to the distributees whose interests are affected thereby." A.R.S. § 14-3933(A)(2), (3). Although

8

the parties agree a PR is not statutorily obligated to file a supplementary inventory or interim accounting whenever the value of estate assets changes, the requirements in §§ 14-3708 and 14-3933 are at least consistent with the view that the value of estate assets at the time of the testator's death is not the only value that matters for distribution and accounting purposes.

¶16 We also note that the abatement statute, § 14-3902, is found in a statutory article entitled "Special Provisions Relating to Distribution." Likewise, the title of § 14-3902 includes the term "distribution" and the statute itself refers to "shares of distributees," suggesting that abatement is tied more closely to the distribution of an estate than to the initial inventory required by A.R.S. § 14-3706. *Cf. United States Parking Sys. v. City of Phoenix*, 160 Ariz. 210, 211-12, 772 P.2d 33, 34-35 (App. 1989) ("[W]e can nevertheless refer to titles and captions for indications of legislative intent."). Similarly, when a distribution is to be made in kind, the asset to be distributed is to be valued at or near the time of distribution, not the time of the testator's death. A.R.S. § 14-3906(A)(2)(b), (A)(3).[2] In sum, although no statute specifically addresses this issue, the Arizona statutory scheme

---

[2]As Jay correctly points out, A.R.S. § 14-3906 addresses distributions in kind, which are not at issue in this case. We disagree with him, however, that the section is therefore "not relevant to the issue presented" here. The means by which a personal representative is to value property for one type of distribution is relevant, at least by analogy, to the question of how a representative should value property for other types of distribution and for purposes of abatement. *Cf. Robson Ranch Mountains, L.L.C. v. Pinal County*, 203 Ariz. 120, ¶ 13, 51 P.3d 342, 347 (App. 2002) ("We . . . seek to harmonize related statutory provisions and 'aim to achieve consistency among them' in the context of the overall statutory scheme."), *quoting Bills v. Ariz. Prop. & Cas. Ins. Guar. Fund*, 194 Ariz. 488, ¶ 18, 984 P.2d 574, 580 (App. 1999).

relating to distributions from an estate suggests that the value of assets at the time of distribution is relevant and that the value at the time of the testator's death is not controlling.

¶17 Further, we are not persuaded by the cases, both Arizona and out-of-state, on which Jay relies. Those cases merely stand for the propositions that a devisee's interest in the estate vests at the testator's death, *Betts v. Renfro*, 148 So. 406, 409 (Ala. 1933), and that the purpose of an inventory is to create a record of the assets of the estate, *Lowry v. Crandall*, 52 Ariz. 501, 503, 83 P.2d 1003, 1004 (1938). It is undisputed here that the Foundation has a vested interest in the estate; the only issue is whether the devise in which it has an interest has abated. And, as noted above, Arizona law requires that an inventory be updated throughout the administration of the estate whenever valuations set forth in the original inventory are deemed "erroneous or misleading." § 14-3708.

¶18 Raising various policy concerns, Jay also argues that, "[i]n order to facilitate the orderly administration of the estate," to lend certainty and predictability to the PR's role, and to eliminate "the unavoidable conflicts that will certainly emerge between abated and unabated beneficiaries where abatement decisions are made at the time future distributions are made," "the law should require that date of death values be used to determine abatement." And, Jay further contends, "[u]se of a date certain [to value the estate for abatement purposes] eliminates the need to speculate about future values."

¶19 Elaborating on these points at oral argument in this court, Jay urged us to adopt a bright-line, date-of-death valuation rule for abatement because such a rule could be

easily applied and would avoid the conflicting fiduciary duties he asserts a PR otherwise would face. A PR owes a fiduciary duty to all beneficiaries to keep them reasonably informed of the estate and its administration and to deal with estate assets in a manner in which a prudent person would deal with the property of another. *See* A.R.S. §§ 14-3703(A); 14-7302; 14-7303; *see also In re Warren's Estate*, 74 Ariz. 319, 322, 248 P.2d 873, 875 (1952) (PR "owes a distinct and binding duty to the devisees and creditors alike to properly account to them through the court concerning the management of the estate"), *modified on rehearing*, 74 Ariz. 385, 249 P.2d 948 (1952); *In re Estate of Pedelty*, 61 Ariz. 425, 434, 150 P.2d 362, 366 (1944) (PR "should handle [estate] with the same business acumen that he would handle a similar business matter of his own"). In addition, a PR is obligated "to settle and distribute the estate . . . as expeditiously and efficiently as is consistent with the best interests of the estate." § 14-3703(A).

¶20 According to Jay, those duties would clash if a date-of-distribution rule for abatement purposes were adopted. Such a rule, Jay argues, would create a conflict between a PR's duty to unabated beneficiaries, whose interests would often be best served by a prompt disposition of the estate assets, and potentially abated beneficiaries, whose devises might not abate if disposition of the estate were delayed in hopes that, over time, the estate's value would increase sufficiently to cover their interests.

¶21 We are not persuaded by these arguments. First, it is not clear that a date-of-death valuation rule would be more easily applied, or more likely to avoid the conundrum

Jay postulates, than would a rule by which abatement is determined based on the value of estate assets at the time of distribution. If assets were to be valued for abatement purposes as of the testator's date of death but, as in this case, the estate assets appreciate in value during administration of the estate, the question of what to do with the excess value would remain. The PR could not simply allocate that excess to the unabated beneficiaries absent legal authority or a will provision to that effect. Nor could the PR disregard the order of abatement prescribed in § 14-3902(A), unless the will expressly provided a different order of abatement or the statutory scheme would defeat "the testamentary plan or the express or implied purpose of the devise." § 14-3902(B).

¶22 Thus, even if a date-of-death valuation applied, when estate assets appreciate in value during administration of the estate and all unabated devises have been satisfied, abated bequests quite likely would have to somehow be "unabated" in order to follow the testator's intent. In other words, even under the date-of-death valuation rule Jay advocates, a PR easily could face essentially the same dilemma a date-of-distribution valuation rule might pose.

¶23 In addition, the PR fiduciary conflicts Jay postulates are not only speculative but also manageable. The law does not prohibit PRs from making partial distribution of estate assets to specific beneficiaries in accordance with will provisions. Indeed, the record reflects that during the nine years after Elliot's death, Jay made periodic, partial distributions of estate assets at various times and to various devisees under the will. Thus, as Jay's own

actions illustrate, a PR's alleged dilemma concerning distributions to unabated beneficiaries could be largely illusory.

¶24 In addition, if a PR intends and is ready to distribute estate assets expeditiously but, by doing so, might cause certain devises to abate, the PR is not without recourse. Rather, a PR faced with such a situation could "petition for an order of complete settlement of the estate" and request the probate court to "consider the final account" and approve the PR's "accounting and distribution." A.R.S. § 14-3931(A). The probate court, in turn, may "determin[e] the persons entitled to distribution of the estate," approve "settlement and . . . distribution of the estate and discharg[e] the [PR] from further claim or demand of any interested person." *Id.; see also In re Estate of Thurston*, 199 Ariz. 215, ¶ 19, 16 P.3d 776, 780 (App. 2000) (absent fraudulent concealment or misrepresentation in presenting accounting or obtaining court approval, "the [probate] court's approval of an estate administrator's accounting bars an attempt to reopen consideration of items presented in the accounting").

¶25 In sum, Jay's policy arguments do not clearly militate in favor of adopting a date-of-death valuation rule for abatement purposes. Rather, in our view, a rule requiring date-of-distribution values to be used in determining abatement will encourage PRs "to settle and distribute the estate . . . as expeditiously and efficiently as is consistent with the best interests of the estate," A.R.S. § 14-3703(A), rather than delaying the distribution in a

manner that might result in an appreciated value of estate assets with no clear recipient beneficiaries.[3]

¶26        Jay also maintains that Elliot's "[w]ill creates testamentary trusts for [the children] and provides that the trusts may be funded with cash or property." And, he posits, "[t]he transfer [of assets] into a testamentary trust occurs automatically upon death of the testator." According to Jay, he "is not attempting to preserve . . . residuary devises" because the "post-death appreciation [of the estate] benefits the . . . children['s] trusts on account of their status as Article Fourth beneficiaries—not because they were named as residuary beneficiaries." Therefore, he suggests the abatement of the fifth article devises does not benefit the residuary estate, but rather, benefits the devises to the children's trusts as an increase in value of trust assets.

¶27        In his arguments below, however, Jay consistently took the position that "[a]ny money recovered from the prior distributions [to the other fifth article devisees] would

---

[3]This view is consistent with the few decided cases we have found that, though distinguishable, tangentially address this point. In *In re Estate of Zalaznick*, 389 N.Y.S.2d 736, 738 (N.Y. Sur. Ct. 1976), the New York court found: "Neither the applicable statutory or case law sanctions a result under which a distribution for residuary beneficiaries can increase at the expense of abating general or specific bequests." Although New York, unlike Arizona, is not a Uniform Probate Code state, we find the *Zalaznick* court's reasoning instructive. *Cf. Bunker's Glass Co. v. Pilkington PLC*, 202 Ariz. 481, ¶ 40, 47 P.3d 1119, 1129 (App. 2002) (although not binding, "the laws of other jurisdictions [are] sometimes instructive"); *see also In re Will of Maglin*, 379 N.Y.S.2d 213, 215 (N.Y. Sur. Ct. 1975) ("In the absence of any expressed directions to the contrary, assets are to be valued as of the date of distribution.").

ultimately go to the remainder beneficiaries."[4]  Because Jay did not raise his new

testamentary trust argument below, he has waived it.  *See Trantor v. Fredrikson*, 179 Ariz.

299, 300, 878 P.2d 657, 658 (1994) ("Because a trial court and opposing counsel should

be afforded the opportunity to correct any asserted defects before error may be raised on

appeal, . . . errors not raised in the trial court cannot be raised on appeal." ).[5]

¶28         Finally, we note that a fundamental purpose of the law of decedents' estates

is "[t]o discover and make effective the intent of a decedent in distribution of his property."

A.R.S. § 14-1102(B)(2).  As noted earlier, Elliot clearly expressed an intent in his will to

prioritize the fourth article beneficiaries over the charitable beneficiaries covered in the fifth

article.  By doing so, he implicitly provided that the fifth article devises would abate before

those set forth in the fourth article.  But Elliot did not express any intent that a date-of-death

valuation of his estate should control for abatement purposes.  And he expressly included

bequests to various charitable organizations, including the Foundation, in his will.  In short,

nothing in the will suggests that Elliott intended the charitable bequests to abate under the

---

[4]As noted earlier, n.1, *supra*, Jay maintained below and on appeal that the payments he made to the other fifth article devisees could be recovered under A.R.S. § 14-3909 if those devises were found to have abated.

[5]As noted in ¶ 2, *supra*, Elliot's will expressly stated his "intention that the value of each [child's] trust not exceed $900,000.00." Although the will directed that "cash or assets having [that] value" be placed in each child's trust, the will did not provide that any appreciated value of other estate assets accrue to the trusts. Nor does the record reflect that the appreciation in value of the estate's assets during administration of the estate arose from assets that were used to fund the trusts or that were in any way related to them.

15

circumstances presented here, in which the value of estate assets dramatically appreciated during the prolonged administration of his estate.

## DISPOSITION

**¶29** The judgment of the trial court is affirmed.


_____
JOHN PELANDER, Chief Judge

CONCURRING:


_____
JOSEPH W. HOWARD, Presiding Judge


_____
GARYE L. VÁSQUEZ, Judge