IN THE COURT OF APPEALS
STATE OF ARIZONA
DIVISION TWO

| | | |
|---|---|---|
| MITCHELL HALL, | ) | 2 CA-CV 2006-0137 |
| | ) | DEPARTMENT A |
| Counterclaimant/Appellant, | ) | |
| | ) | **O P I N I O N** |
| v. | ) | |
| | ) | |
| SANDRA SMITH, | ) | |
| | ) | |
| Counterdefendant/Appellee. | ) | |
| | ) | |

APPEAL FROM THE SUPERIOR COURT OF PIMA COUNTY

Cause No. C315390

Honorable Charles Harrington, Judge

AFFIRMED

Law Office of Alan N. Ariav, PC
  By Alan N. Ariav                                                    Phoenix
                              Attorneys for Counterclaimant/Appellant

Goering, Roberts, Rubin, Brogna, Enos
& Treadwell-Rubin, P.C.
  By Christopher L. Enos and Kristin A. Green                        Tucson
                              Attorneys for Counterdefendant/Appellee

P E L A N D E R, Chief Judge.

¶1     Appellant Mitchell Hall appeals from a summary judgment entered in favor of appellee Sandra Smith on Hall's defamation counterclaim against her after Smith brought an action against Hall and others for wrongful termination. The defamation counterclaim arose from a letter Smith had written during the course of this litigation to the chief executive officer (CEO) of the parent company of the Arizona subsidiary for which both Hall and Smith worked. Finding that the absolute judicial privilege applied to the letter, the trial court granted summary judgment in favor of Smith. Hall argues on appeal the trial court improperly overlooked principles of corporate law and wrongly applied the privilege. We disagree and, therefore, affirm.

## BACKGROUND

¶2     On appeal from a summary judgment, we view all facts of record and reasonable inferences therefrom in the light most favorable to the party against whom judgment was entered. *Bothell v. Two Point Acres, Inc.*, 192 Ariz. 313, ¶ 2, 965 P.2d 47, 49 (App. 1998). In 1995, CIGNA Health Plan of Arizona, Inc. (CIGNA AZ) eliminated Smith's position within that company. She subsequently filed this wrongful termination action against her employer (CIGNA AZ), Dr. Gilbert Burkel, its Tucson Medical Director, and Hall, its Executive Director. Smith alleged their elimination of her position was a pretext to terminate her employment. Smith further alleged she actually had been terminated for "refus[ing] to administer narcotic drugs and other controlled substances to patients who . . . she concluded were seeking to obtain such by fraud" and for "report[ing]

2

concerns about funds for patient care which were being diverted by . . . Hall for his own personal purposes."

**¶3** After nearly eight years of litigation, in July 2004, Smith wrote a letter to Edward Hanway, the CEO of CIGNA Corporation (CIGNA), the parent company of CIGNA AZ. In her letter, Smith stated, inter alia, she had filed a wrongful termination action against CIGNA AZ and outlined the allegations of her complaint. She also said that, after "significant disclosure" in the case, "it [was] exceedingly clear that Hall and colleagues were indeed 'diverting' millions of dollars annually" and that "large portions of these funds were diverted directly into the refurbishing of a former Tucson restaurant into what was intended to be a rather elaborate gay bar." She described this "gay bar" as not "just any old gay bar, but perhaps one with a heavy flavor of high-tech kinkiness guaranteed to be abhorrent to CIGNA clients and shareholders alike." She also suggested that Hall had "socialized . . . over the years" with "the good old judge" who was originally assigned to the case. Finally, she suggested "direct negotiations" between herself and Hanway "in order to resolve this matter as promptly as possible."

**¶4** Although Smith sent the letter directly to Hanway by certified mail, Hanway never actually saw it. Rather, an executive secretary at CIGNA forwarded it through the executive office of the president to CIGNA's legal department. After several people in that department read the letter, it was sent to counsel for CIGNA AZ, who in turn forwarded it to Hall's attorney. Based on that letter, Hall filed a counterclaim for defamation, alleging

3

that "Smith [had made] numerous false and defamatory statements about [him]" in the letter and that, "[b]ecause the letter was written to a third party, . . . Smith [wa]s not entitled to any qualified or absolute privilege of judicial immunity."

¶5 Smith moved to dismiss Hall's counterclaim, arguing that her letter was covered by the absolute judicial privilege. Hall responded to the motion, but Smith eventually withdrew it after her attorneys apparently concluded that it "[wa]s not likely to succeed" at that point. In response to two motions for summary judgment Hall filed, Smith also moved for partial summary judgment, again arguing, inter alia, that the letter was privileged. The trial court denied both parties' motions, finding "genuine issues of material fact remain[ed]."

¶6 Shortly before trial was to begin on both Smith's wrongful termination claim and Hall's defamation counterclaim, Smith settled her case with CIGNA AZ, leaving only the defamation claim for trial.[1] During trial, Hall's counsel informed the court that he had newly discovered evidence showing Hall had never embezzled money from CIGNA AZ. Smith objected to the voluminous, new records based on untimely disclosure, and the trial court declared a mistrial on that basis. Thereafter, both parties again moved for summary judgment, relying on not only the evidence before the court in the previous motions but also evidence presented at trial. In a thorough and detailed ruling, the trial court granted Smith's

---

[1]The case was therefore recaptioned "Mitchell Hall v. Sandra Smith."

4

motion, finding her letter to Hanway covered by the absolute judicial privilege. This appeal followed.

## DISCUSSION

### I. Absolute judicial privilege

¶7      In several related arguments, Hall contends the trial court erred in granting summary judgment in Smith's favor because it improperly applied the absolute judicial privilege. He maintains the privilege does not apply here because Smith sent her allegedly defamatory letter "to a non-party in the underlying litigation," the CEO of CIGNA AZ's parent corporation, which undisputedly is a separate corporate entity. "We review a trial court's grant of summary judgment *de novo* and independently determine whether a court's legal conclusions were correct." *Ledvina v. Cerasani*, 213 Ariz. 569, ¶ 3, 146 P.3d 70, 71 (App. 2006). In addition, "[w]hether a communication is privileged is a question of law for the court; we are not bound by the trial court's conclusions of law, which we review *de novo*." *Johnson v. McDonald*, 197 Ariz. 155, ¶ 2, 3 P.3d 1075, 1077 (App. 1999); *see also Green Acres Trust v. London*, 141 Ariz. 609, 613, 688 P.2d 617, 621 (1984); *Sobol v. Alarcon*, 212 Ariz. 315, n.2, 131 P.3d 487, 489 n.2 (App. 2006).

¶8      With respect to parties to court proceedings such as Smith, the Restatement (Second) of Torts (1977) describes the absolute judicial privilege as follows:

> A party to a private litigation . . . is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, or in the institution of or during the course and as a part of, a

5

judicial proceeding in which he participates, if the matter has some relation to the proceeding.

Restatement (Second) Torts § 587;[2] *see also Johnson*, 197 Ariz. 155, ¶ 12, 3 P.3d at 1078. The privilege applies to both attorneys and parties to litigation. *See Green Acres*, 141 Ariz. at 613, 688 P.2d at 621; Restatement §§ 586, 587. And, "[t]he defense is absolute in that the speaker's motive, purpose or reasonableness in uttering a false statement do not affect the defense." *Green Acres*, 141 Ariz. at 613, 688 P.2d at 621; *see also Sobol*, 212 Ariz. 315, ¶ 11, 131 P.3d at 490. The purpose of the privilege is to ensure "the fearless prosecution and defense of claims which leads to complete exposure of pertinent information for a tribunal's disposition." *Green Acres*, 141 Ariz. at 613, 688 P.2d at 621; *see also Krouse v. Bower*, 20 P.3d 895, 900 (Utah 2001).

¶9    Hall argues the privilege does not apply here. Relying on several California decisions (one of which was unpublished[3]), he argues "[i]t is black-letter law that defamatory statements made to a non-party in litigation are not protected by the absolute judicial privilege." But those cases rely on California's statutory definition of judicial privilege, codified at Cal. Civ. Code § 47(b) (2005). Absent any similar statute in Arizona, we find

---

[2]Our supreme court has cited with approval Restatement § 586 relating to attorneys. *See Green Acres Trust v. London*, 141 Ariz. 609, 613, 688 P.2d 617, 621 (1984). And this court has embraced Restatement § 587, the companion provision relating to parties. *See Ledvina v. Cerasani*, 213 Ariz. 569, ¶ 10, 146 P.3d 70, 73-74 (App. 2006) (noting that Arizona courts look to Restatement for guidance in resolving issues in defamation cases).

[3]It is improper to cite out-of-state, unpublished memorandum decisions. *See Walden Books Co. v. Dep't of Revenue*, 198 Ariz. 584, ¶¶ 20-23, 12 P.3d 809, 814 (App. 2000).

6

those cases inapplicable to whether communications to non-parties are protected by the privilege in this state.

¶10 In both *Green Acres* and *Johnson*, the absolute judicial privilege was found inapplicable to allegedly defamatory communications made to various non-parties (a newspaper reporter and some Arizona legislators). But because Arizona case law has not foreclosed the judicial privilege from possibly applying to a litigant's communications with non-parties, we must first determine what standard should be applied in resolving that issue. Restatement § 587 does not address the requisite relationship the recipient must have to the proceeding in order for the privilege to attach. The pertinent Arizona cases, however, provide some guidance on that issue.

¶11 In *Green Acres*, our supreme court stated, "both content and manner of extra-judicial communications must bear 'some relation to the proceeding.'" 141 Ariz. at 614, 688 P.2d at 622, *quoting Asay v. Hallmark Cards, Inc.*, 594 F.2d 692, 697 (8th Cir. 1979).[4] And, the court further stated, "the recipient of the extra-judicial communication [must] have some relationship to the proposed or pending judicial proceeding for the occasion to be privileged." *Id.* The court also cited with approval *Troutman v. Erlandson*, 593 P.2d 793, 795 (Or. 1979), which "require[d a] recipient to have [a] 'close or direct'

---

[4]In its ruling below, the trial court noted Hall had "admit[ted] that the first prong [i.e., content] of *Green Acres* is satisfied and that 'the applicability of the absolute judicial privilege hinges on the second element, the recipient's relationship to the proceedings.'" Similarly, on appeal Hall does not challenge the content of Smith's letter as privileged. *See* Restatement (Second) of Torts § 587, cmt. c (1977).

relationship to the proceedings" for the privilege to apply. *Green Acres*, 141 Ariz. at 614, 688 P.2d at 622.

**¶12** More recently, in *Johnson*, Division One of this court recognized as controlling law the *Green Acres* standard requiring that the recipient have some relationship to the proceeding. 197 Ariz. 155, ¶ 13, 3 P.3d at 1078-79. After examining several out-of-state cases involving communications to non-parties, the *Johnson* court concluded, "for the judicial privilege to apply, the recipient of the communications must have a direct interest in the litigation or possess evidentiary information directly relevant to it." *Id.* ¶ 19.

**¶13** Thus, although Arizona case law, as the trial court noted, has somewhat "muddie[d] the waters" on the appropriate standard to apply in this area, in our view the recipient must have had a close or direct relationship to the proceeding for the privilege to apply. Exactly how close or direct that relationship must be can only be determined on a case-by-case basis, with a focus on the underlying principle that the privilege should be applied to "promote candid and honest communication between the parties and their counsel in order to resolve disputes." *Krouse*, 20 P.3d at 900; *see also Sriberg v. Raymond*, 544 F.2d 15, 17 (1st Cir. 1976) ("Although, in reality, the escrow agent may have been no more than a neutral stakeholder, the nature of the privilege requires that we examine the relationship between the libel and the contemplated suit from the viewpoint of the attorney."). In addition, a case-specific analysis not only is consistent with, but also should be informed by, the general principle that "the tendency and policy of the courts is to not

extend the number or instances of absolute privilege unless the policy upon which privilege is based is found to exist in the new situations." *Laun v. Union Elec. Co.*, 166 S.W.2d 1065, 1069 (Mo. 1943); *see also Sobol*, 212 Ariz. 315, ¶ 12, 131 P.3d at 490 ("Because absolute immunity immunizes absolutely, it is reserved for '"those situations where the public interest is so vital and apparent that it mandates complete freedom of expression without inquiry into a defendant's motives."'"), *quoting Burns v. Davis*, 196 Ariz. 155, ¶ 11, 993 P.2d 1119, 1124 (App. 1999), *quoting Supry v. Bolduc*, 293 A.2d 767, 769 (N.H. 1972).

¶14    We must then turn to the specific facts of this case to determine if CIGNA, through Hanway,[5] had a sufficient relationship to the litigation between Smith and CIGNA AZ so as to give rise to the privilege. Hall primarily relies on corporate law principles to support his argument that CIGNA did not have any relationship to the proceedings. There is no dispute that CIGNA, as a separate corporate entity, was not a party to this action. And, as the trial court noted, it also is undisputed that CIGNA and its subsidiary, CIGNA AZ, had "different budgets, boards of directors, CEO's, states of incorporation, and principal places of business." Because those undisputed facts do not necessarily foreclose application of the

---

[5]Because Hanway acted as an agent of CIGNA, the fact that he personally was not, as Hall argues, "a party, . . . a potential witness . . . and . . . has not participated in any settlement negotiations of this matter" is immaterial. *See Lois Grunow Mem'l Clinic v. Davis*, 49 Ariz. 277, 284, 66 P.2d 238, 241 (1937) ("corporation acts only through its agents"). Similarly, for this reason, we find no merit in Hall's argument that Smith's letter was excessively published.

judicial privilege, however, we find much of Hall's discussion of CIGNA's "Fortune 500" status, corporate form, and general parent-subsidiary principles largely irrelevant. Rather, our resolution of this issue pivots not on the relationship between CIGNA and CIGNA AZ, but on the relationship between CIGNA and the litigation between Smith and CIGNA AZ.

¶15 On that pertinent question, the record reflects that CIGNA was significantly involved in the Smith-CIGNA AZ litigation. CIGNA sent several of its own employees to investigate Hall's alleged embezzlement of corporate funds, the crux of Smith's claims in her wrongful termination action. And, as Hall conceded at oral argument in this court, CIGNA selected the Arizona attorneys who defended CIGNA AZ and the other defendants in this case. Although Hall denies that CIGNA paid those attorneys, undisputed facts in the record support the trial court's conclusion that CIGNA employees/attorneys "orchestrat[ed] the defense of Smith's lawsuit against CIGNA AZ." Indeed, in a motion controverting Smith's motion to set and certificate of readiness, John Tellier, then "Co-Counsel for Defendants," stated that "the attorney primarily in charge of the handling [of the wrongful termination case] was Michael Davis, senior counsel in CIGNA's law department, in Philadelphia, Pennsylvania." And, billing records provided to the trial court in the Smith-CIGNA AZ litigation showed numerous telephone calls and letters between Tellier and Christine

10

Ciarrocchi, "an in-house attorney" for CIGNA.[6] Similarly, in an application for attorney fees below, Tellier stated that Ciarrocchi had been assigned "to oversee this litigation."

¶16    Additionally, Burkel testified at trial that "[i]f there was somebody at corporate Phoenix doing something wrong, [he] would have taken it up to the level of corporate national." He also testified that "corporate national [wa]s involved in the Arizona CIGNA all along during the course of [his] working as the health doctor [sic] . . . in Tucson." Furthermore, the settlement agreement between Smith and CIGNA AZ included language releasing CIGNA from liability.[7] And Burkel's testimony also suggests that CIGNA had a direct interest in the business and litigation of its subsidiary. In sum, CIGNA had a significant interest in the litigation between Smith and CIGNA AZ and directly involved itself in the case.

---

[6]In his reply brief, Hall argues that reliance on the involvement of these CIGNA employees as indicating a direct relationship to the litigation "ignores the fact [CIGNA AZ], like most subsidiaries, does not have its own legal department. . . . Mr. Laddon [a CIGNA attorney] actually dealt with managers and supervisors at [CIGNA AZ] in Phoenix and Tucson who actually oversaw the investigation." We see no relevant difference in this distinction. That a parent corporation provides legal services for its subsidiaries or that its employees work with those subsidiaries to accomplish their work does not change the fact that CIGNA was directly involved in investigating Smith's allegations and providing a defense against them in the underlying litigation. In addition, in resolving the issue of judicial privilege here, we focus not on the explanatory reasons for CIGNA's involvement in the underlying litigation, but rather, only on the facts pertaining to such involvement.

[7]The trial court stated it gave the release language "little weight" because it was likely "standard boilerplate for release agreements." We agree, but still find the release of CIGNA a relevant factual point in our evaluation of its relationship to the litigation.

¶17 We cannot agree with Hall's apparent suggestion that the standard of close or direct involvement found in Arizona privilege law requires a defendant to a defamation action to show that a subsidiary is essentially an alter-ego of its parent before the judicial privilege can apply. Unlike the situation in *Laun v. Union Electric Co. of Missouri*, 166 S.W.2d 1065, 1067-68 (Mo. 1943), the parent company here will not be subjected to liability for the acts of its subsidiaries or for its own actions through its subsidiaries. Thus, the corporate form's "legitimate purpose of insulating individuals [or related but separate corporations] from personal liability for acts done on behalf of the corporation," *Malisewski v. Singer*, 123 Ariz. 195, 196, 598 P.2d 1014, 1015 (App. 1979), is not implicated here.

¶18 Ultimately, like the trial court, we find the factual circumstances here more analogous to those where the privilege has been applied than to those where it has not. Courts have routinely rejected privilege claims when the recipient of the allegedly defamatory communication had no relation to the litigation and the communication would merely serve to "achieve an advantage in litigation." *Johnson*, 197 Ariz. 155, ¶ 20, 3 P.3d at 1080; *see also Green Acres*, 141 Ariz. at 615, 688 P.2d at 623; *Rothman v. Jackson*, 57 Cal. Rptr. 2d 284, 293 (Cal. Dist. Ct. App. 1996); *cf. Chilton v. Ctr. for Biological Diversity, Inc.*, 214 Ariz. 47, ¶ 15, 148 P.3d 91, 97 (App. 2006) (material published on defendant's website not absolutely privileged when done outside any legislative, judicial, or administrative proceeding). Unlike those situations, CIGNA was directly involved in the

12

litigation here, selecting counsel for CIGNA AZ and actively investigating allegations against Hall.

¶19 In several cases, courts have applied the privilege to communications with a litigant's insurer. *See, e.g., O'Neil v. Cunningham*, 173 Cal. Rptr. 422 (Cal. Dist. Ct. App. 1981) (cited with approval in *Johnson*, 197 Ariz. 155, ¶ 16, 3 P.3d at 1079); *Chard v. Galton*, 559 P.2d 1280 (Or. 1977) (cited with implicit approval in *Green Acres*, 141 Ariz. at 615, 688 P.2d at 623). Like a parent company, an insurer is a separate legal entity, but it has a direct interest in the litigation because it ultimately will pay for a defense and for any covered, recoverable claims. As Hall points out, those interests are different in nature; but we cannot agree with his further assertion that CIGNA is therefore simply a "*non-party* with no interest in [the] litigation." Its interests are simply different than those of an insurer.

¶20 Likewise, the New Mexico Court of Appeals found that an allegedly defamatory letter written to opposing counsel and also sent to the opposing party's lessee was privileged because, although not formally a party to the litigation, the lessee was "directly affected" by it. *Romero v. Prince*, 513 P.2d 717, 720 (N.M. Ct. App. 1973). The lessee there was not a party but nonetheless had a practical interest in the litigation's outcome. Similarly, as demonstrated by its direct involvement in and investigation of the underlying litigation, CIGNA had an interest in the outcome of Smith's wrongful termination action.

13

¶21 When considered in light of the policy underlying the privilege, CIGNA's relationship to the litigation becomes even clearer. As noted earlier, *see* ¶ 16, *supra*, Burkel testified that CIGNA would be involved if "somebody at corporate Phoenix [was] doing something wrong" and that "[t]here was always a direct relationship back and forth, up and down vertically, as well as horizontally."[8] In other words, CIGNA would intervene in a problematic situation at CIGNA AZ if necessary. In view of that evidence, we cannot say that a letter written to CIGNA's CEO could not have advanced the possibility of settling the litigation. *See Green Acres*, 141 Ariz. at 613, 688 P.2d at 621. And the letter here, written to a person with at least some authority to intervene in the case, certainly rose above the level of merely "achiev[ing] an advantage in litigation" rejected in *Johnson*. 197 Ariz. 155, ¶ 20, 3 P.3d at 1080. Thus, we agree with the trial court that CIGNA's relationship to this litigation was close and direct and, therefore, the privilege applies.

¶22 Hall describes a host of bad, "slippery slope" ramifications that might result from applying the privilege here, including expanding the privilege to cover defamatory

---

[8]In his reply brief and at oral argument in this court, Hall argued Burkel "never dealt with the parent company" and his testimony was inaccurate and merely a "speculative conclusion." But no admissible evidence in the record directly refutes Burkel's testimony about the interaction between CIGNA and CIGNA AZ, despite their being separate corporate entities. *See In re 1996 Nissan Sentra*, 201 Ariz. 114, ¶ 6, 32 P.3d 39, 42 (App. 2001) ("'Generally the "facts" which the trial court will consider as "admissible in evidence" in ruling on a motion for summary judgment are those which are set forth in an affidavit or deposition; an unsworn and unproven assertion in a memorandum is not such a fact.'"), *quoting Prairie State Bank v. IRS*, 155 Ariz. 219, 221 n.1A, 745 P.2d 966, 968 n.1A (App. 1987).

letters written to shareholders, employees, or vendors of large, publicly traded companies. But none of those factual situations is before us in this case. By finding CIGNA was closely or directly involved in the litigation here, we are not holding that a parent company will always have a sufficiently close relationship to the litigation of a subsidiary to allow for the privilege. Rather, as noted above, application of the judicial privilege hinges on a case-specific, fact-intensive inquiry. And, "we recognize absolute immunity in the context of a defamation action may be lost or forfeited if the speaker distributes or disseminates the defamatory statement outside of the proceeding or context which gives rise to the immunity." *Sobol*, 212 Ariz. 315, ¶ 22, 131 P.3d at 491-92.

**¶23** We reject Hall's argument that Smith might have published her letter to "potentially thousands of [America Online] subscribers" by producing the letter in her America Online account. Hall does not cite any evidence in the record to support the contention that any other America Online users saw the letter. *See* Ariz. R. Civ. App. P. 13(a)(6), 17B A.R.S. Similarly, to the extent he argues that persons other than CIGNA employees or those covered by Smith's attorney-client or other privilege saw the letter, he fails to cite any evidence in the record to support that contention. *See id.* In any event, "[s]heer speculation is insufficient . . . to defeat summary judgment." *Badia v. City of Casa Grande*, 195 Ariz. 349, ¶ 29, 988 P.2d 134, 142 (App. 1999).

**¶24** Finally, we also find no merit in Hall's argument that "[t]he trial court improperly pierced the corporate veil of the Fortune 500 corporation." The principle of

15

piercing a corporate veil applies to claims for which one seeks to reach the personal assets of a corporation's directors or shareholders. *See Leo Eisenberg & Co., Inc. v. Payson*, 162 Ariz. 529, 534, 785 P.2d 49, 54 (1989). CIGNA's liability or that of its shareholders or directors on any legal theory, however, is not an issue in this case.

## II. Alleged factual issues

¶25　　　In contrast to his assertions in summary judgment motions below, Hall also contends "genuine factual issues exist as to the relationship between" CIGNA AZ and CIGNA, rendering summary judgment inappropriate. "On appeal from a summary judgment, we must determine *de novo* whether there are any genuine issues of material fact . . . ." *Bothell*, 192 Ariz. 313, ¶ 8, 965 P.2d at 50.

¶26　　　Hall first states that, "contrary to the erroneous statements Dr. Smith made to the trial court, [CIGNA] does not pay the legal fees incurred by its subsidiaries, including [CIGNA AZ]." But the portion of Smith's trial testimony contained in the record before us does not include any testimony to that effect. And Hall has not cited, nor have we found, any such statements in Smith's deposition testimony. In its summary judgment ruling, the trial court did find that CIGNA attorneys were "orchestrating the defense of Smith's lawsuit against CIGNA AZ." Regardless of which entity paid the attorney fees for the defense against Smith's claims, the uncontroverted evidence in the record reflects that "the attorney primarily in charge of the handling [of the wrongful termination case] was Michael Davis,

16

senior counsel in CIGNA's law department, in Philadelphia, Pennsylvania." Thus, there is no direct factual dispute on this point.

¶27 Hall next argues a dispute of fact exists about the release signed in the settlement between Smith and CIGNA AZ on her wrongful termination claims. He maintains "Smith . . . argued that her wrongful-termination settlement with [CIGNA AZ] required a release of the parent." According to Hall, "this shows an utter lack of understanding of fundamental corporate law and parent-subsidiary relationships." But he does not dispute that the release did include CIGNA. In sum, none of the alleged "disputes" that Hall raises is actually a genuine issue of material fact, but rather are disputes about the legal conclusions to be drawn from those facts. As discussed above, we agree with those conclusions the trial court properly drew as a matter of law.[9] *See Green Acres*, 141 Ariz. at 613, 688 P.2d at 621.

### III. Law-of-the-case doctrine

---

[9]Hall also argues, without citation to authority, that "[t]he court should have allowed [him] to testify at trial about the relationship of the two corporations" before declaring a mistrial. But the trial court in fact had evidence about the relationship of the two companies before it when it ruled on summary judgment, both in the form of Hall's affidavit on the subject and in answers to his interrogatories. If Hall wanted to rebut any of Burkel's testimony or otherwise establish a genuine issue of material fact, he had a full and fair opportunity to do so in opposing Smith's most recent motion for summary judgment. He failed to do so. And, contrary to Hall's assertions, it was not for the jury to decide any questions about "the closeness of the corporate operations" for purposes of determining the legal issue of judicial privilege, at least when the relevant facts bearing on that issue were undisputed. *See Green Acres Trust v. London*, 141 Ariz. 609, 613, 688 P.2d 617, 621 (1984).

17

¶28 Finally, Hall maintains the trial court's ultimate summary judgment ruling violated the law-of-the-case doctrine. That doctrine is "'the judicial policy of refusing to reopen questions previously decided in the same case by the same court or a higher appellate court.'" *Jimenez v. Wal-Mart Stores, Inc.*, 206 Ariz. 424, ¶ 12, 79 P.3d 673, 677 (App. 2003), *quoting Powell-Cerkoney v. TCR-Montana Ranch Joint Venture, II*, 176 Ariz. 275, 278, 860 P.2d 1328, 1331 (App. 1993). As Smith points out, however, quoting *Love v. Farmers Insurance Group*, 121 Ariz. 71, 73, 588 P.2d 364, 366 (App. 1978), "'the rule is one of procedure, not of substance. A court does not lack the power to change a ruling simply because it ruled on the question at an earlier stage.'"

¶29 We agree with Hall that a trial court's power to reconsider an earlier ruling should not be employed lightly. *See Davis v. Davis*, 195 Ariz. 158, ¶ 14, 985 P.2d 643, 647 (App. 1999). But, Division One of this court has specifically noted that a trial court is not precluded from reconsidering an earlier decision when "a substantial change occurs in . . . evidence." *Powell-Cerkoney*, 176 Ariz. at 279, 860 P.2d at 1332. In this case, the trial court received a substantial amount of evidence, including portions of deposition testimony, various other documents, and three days of trial testimony between the time of Smith's first motion for summary judgment and her post-trial motion, which the court ultimately granted.[10]

---

[10]As Smith points out, Hall also moved for summary judgment after trial on substantially the same grounds as those raised in his pre-trial motion and "[u]nder [his] reasoning, had the trial court granted *his* post-trial Motion . . . , that ruling would have been

**¶30** In addition, "no purpose would be served by forcing a case to trial once it clearly appears that there is no genuine issue of fact between the parties notwithstanding [the fact that] a previous motion for summary judgment has been made and denied." *Mozes v. Daru*, 4 Ariz. App. 385, 389, 420 P.2d 957, 961 (1966). Thus, we cannot say the trial court violated the law-of-the-case doctrine in granting summary judgment on Smith's second motion.

## DISPOSITION

**¶31** For all of the foregoing reasons, the judgment of the trial court is affirmed.

_____
JOHN PELANDER, Chief Judge

CONCURRING:

_____
JOSEPH W. HOWARD, Presiding Judge

_____
GARYE L. VÁSQUEZ, Judge

---

barred" as well.

19